# Bright *v.* Rowland.

An agreement for liquidated damages for the non-performance of covenants of a certain nature and amount, may be enforced for the amount of damages stipulated; but it is otherwise, where the covenant is certain and fixed as to the amount.

Where a deed is mere inducement, profert need not be made; but if made, the adverse party is entitled to oyer.

Where, by the terms of the covenant, money is to be paid and other things to be performed before conveyance, it is not necessary for the vendor to plead a tender of titles on his part; it will be sufficient if he aver readiness to perform.

Where a deed with warranty is tendered, and the other party does not object to it, it is a sufficient offer of performance.

ERROR to the circuit court of Hinds county.

This was an action of covenant brought by the defendant in error against the plaintiff in error. By the covenant, Rowland agreed to sell to Bright, 239 acres of land in Hinds county, at 30 dollars per acre; 325 bushels of corn, at 1 dollar and 25 cents per bushel, and five stacks of fodder at 1 dollar and 20 cents per hundred. Bright agreed to pay for the land in the following manner: 2400 dollars on the 1st of January next ensuing the date of the contract, and the balance in two equal annual instalments from that time, the payments to be secured by promissory notes and a deed of trust on the land. On the day fixed for the first payment, Rowland was to make a deed with general warranty, but not until after the payment was made, and at that time also, Bright was to make the notes and execute the deed of trust, and possession was then to be delivered. The parties further covenanted with each other, " that if either of said parties should fail to perform his part of this contract, then the party so failing shall pay to the other party, the full and just sum of 5000 dollars, by way of liquidated damages and not as a penalty." The breach

[Bright *v*. Rowland.]

assigned is general that the said Bright failed to pay the money, and to execute the notes and deed of trust.

It also appeared, that Rowland tendered a deed with general warranty, which was not accepted.

Hutchinson, for plaintiff in error.

This is an action on the sealed agreement of the parties, of which oyer was had on the first demurrer. The declaration. was amended; and to that Bright, availing himself of the oyer had of the conveyance, of which profert was made likewise, demurred again specially. That was overruled, and Bright not pleading over, judgment was rendered for the 5000 dollars called in the agreement liquidated damages.

The assignment of error involves the propriety of overruling the last demurrer. ·

The agreement is of November 8, 1836, and contains six features:—

1. Rowland contracts to sell the land at 7000 dollars, and the corn, &c.

2. The corn, &c., to be paid for on giving possession of the land.

3. Bright, on January 1, 1837, contracts to pay 2400 dollars, the first instalment of the land; and Rowland is, on or before that day, to make for the land a deed with general warranty, though not bound to do so, until the first payment for it is made.

4. At the conveyance, Bright is to give notes for the other instalments, and a deed of trust to secure them on the land.

5. On conveyance, &c., being made, possession of the land to be given.

6. " And for the faithful performance," it is agreed that either party failing, pay to the other " 5000 dollars as liquidated damages, and not penalty."

The declaration avers, that as to the corn and fodder, Rowland, from the date of contract until January 2, 1837, was ready, &c., to deliver; but Bright did not pay, though notified on December 31, 1836. As to the land, that Bright not having paid the 2400 dollars, nor in any respect performed, Rowland, on the 2d January, 1837, signed, sealed, and offered to deliver the conveyance,

requesting B. to pay, and give the notes and deed of trust, which he refused and failed to do, but no averment that the deed was tendered on January 1, 1837. The deed of conveyance is between Rowland and wife of the first part, and Bright of the second; but is not signed by his wife. There is no averment of readiness or ability to deliver possession.

The covenants of Bright to pay are alleged as conditions precedent to the conveyance.

· The last demurrer states these grounds:

1. That the amended declaration contains no cause of action.

2. That there is variance between it and the agreement.

3. The agreement is executory, voluntary, without consideration, and created no liability.

4. That the declaration does not contain averment of a sufficient performance on the part of Rowland.

5. The conveyance did not embrace dower, and was not tendered on the day stipulated.

My postulates are, that the agreement itself is executory, without consideration, and creating no obligation without an advance, made by the party sought to be charged, toward performance; that the sum named in it as liquidated damages, must be regarded as a penalty; and that, whatever be the legal effect of the agreement there was not such ability and performance on Rowland's behalf, as to entitle him to recover. The first I have not sufficiently explored in order to a fixed and satisfactory conclusion; and, therefore, my views upon it will be offered with much diffidence. Nor is it the least important even to raise it, so to speak, to an equipoise of doubt; for the second and third positions are so perfectly demonstrable that to establish either must ensue in a total reversal of the judgment.

1. The agreement is executory, and without consideration, creating no obligation. All its stipulations are in the future tense or infinitive mood. The land, &c., are to be conveyed and delivered, and paid and secured to be paid for on the 1st of January; nothing executed, all executory. The utmost that it means is, that Rowland is to sell on that day, and Bright is then to pay and secure the prices mentioned. It is nowhere expressed, that one thing is to be done in consideration of another; or that one stipu-

[Bright *v.* Rowland.]

lation is in consequence of another, or the basis of another. The language is unambiguous, and we have no room for inference. At common law, a deed poll imported a consideration, and in general, the consideration of a deed might not be impeached. Our statute lays that doctrine aside; and now the only influence of a seal is to extend the limitation of the remedy on the instrument, or to give it greater dignity, when its subject is the alienation of realty. Before, as since the statute, if the paper purport to contain the agreement and stipulations on both sides, and its language is plain, nothing beyond it, can be supplied, not even for a consideration in a court of law. Equity may supply omissions, through accident, mistake, or fraud. Schermerhorn *v.* Vanderheyden, 1 Johns. Rep. 139. At the making of the deed, nothing passed, nor was any thing to pass until the 1st of January. Even a deed to convey, containing words of bargain and sale *in presenti,* does not transfer the title. Ives *v.* Ives, 13 Johns. Rep. 235. I repeat, that one stipulation is not stated to be the basis of another, only all point to the 1st of January, as the focal point of time for performance. As yet, Rowland has lost nothing—until that day can lose nothing, or receive any conceivable injury, and so with Bright. Was not then the agreement, that I will deliver my corn and fodder, and convey and, deliver my land, if you will pay me so and so? Should they not be permitted to repent and recede without injury? If I promise orally to deliver you my corn and fodder on the calend of January, and you pass nothing to fix the bargain, I am not liable for failure, not civilly bound. So if I owe you a debt, and you promise forbearance without consideration, I cannot enforce the promise. Is it not the same if these were written? And what difference, especially since our statute, can a seal make? These. ideas may be illustrated by Tucker *v.* Wood, 12 Johns. Rep. 190. Can the addition of a penalty transform the transaction, in which the consideration is the vivifying principle? There is one expression in the deed that may have some influence in showing that. *locus penitentiæ* was reserved. Rowland, after stipulating to convey, declares himself not bound to convey until the 2400 dollars are paid. A mutual right undoubtedly must be allowed to Bright not to pay until he could get title. If Rowland had held

**34***

[Bright *v*. Rowland.]

back could Bright by any effort on his part have entitled himself
to recovery or relief on a contract purely executory and without
earnest or consideration?  If, however, the just interpretation of
the instrument be that the stipulations rest, the one upon the
other, then assuredly they must be held to be dependent cove-
nants, and the party complaining, to be entitled, must show full
prompt performance: and that will be lastly considered.

2. The sum demanded and recovered, is only a penalty.  We
need not be alarmed at the denomination the parties have given
it, no more so than if it were a conveyance reeking with fraud,
and yet vaunting its own honesty.  On this subject, the sages of
the temple have spoken and uttered instructive and protective
wisdom.  Our race, in the range of its civil polity, has had no
stay, guide or refuge, so noble, so sublime and so consolatory as
the judiciary.  If it were permitted, that is the altar at which one
might bend with deferential homage.  Judicial power, when pro-
perly exerted, though vast, is essential to keep man in the sphere
of civil liberty, to repress as well his violence and open crime, as
to limit his cupidity, and rebuke his craft and oppression; and
when the mind and the heart, thus imbued and thus directed, fill
the sanctuary of the temple, though we must approach it with
awe, we can come to it with confidence and filial reverence.

The decisions on the point before us, have been made, not
expressly indeed, but tacitly with reference to certain just and
essential principles that are fixed in the very foundations of the
judgment seat, and among them these, that men may make a law
for themselves in many particulars, provided it do not conflict
with the law that is universal, and the provisions of the Civil
Code; that it is with the courts, in the view and application of
those higher laws, to declare the meaning, validity and obligation
of every such private contract or agreement; and that, in such
application, the substance of the contract will be regarded, its
legitimate objects enforced, and all its tendencies to inequality
and injustice, or to fraud and oppression reprehended and con-
trolled; in a word, the civil obligation of the contract, such as
the municipal law does permit or can endure will be ascertained
and sanctioned.

Thus, when avarice, ever insatiable and never sated, invented

[Bright *v.* Rowland.]

*vadium mortuum* as a solemn mode of rapine, the judges then presiding in the English common forum, unable to appreciate the scope of their proper powers, when directed to the great ends of protective justice, looked at the instrument, and though they saw the hardship and abuse that must flourish with impunity, they most pitifully pronounced it above their hook! They were, indeed, narrow minded! But the Jesuit on the woolsack, and thanks to the race for that much, put the proper impress on the transaction, by declaring in effect, that though parties might make a law unto themselves, it should be obligatory only so far as common justice could endure; and it is 'a shame to us at this day, that a mortgage is any thing else than a security in any court. The principle on which the chancellor acted, was that a mortgage, as a class of deeds, ran into common abuse; and that the verbiage assumed by the parties should not be allowed to cover enormities. Penalties were next obtruded, and again the common law courts were embarrassed and stopped short of the mark. Equity relieved, and now law follows equity! Contracts, with clauses of stipulated damages, were next introduced, and upon the proverb, give an inch and take an ell, the exactions were at first quite moderate. Thus in Rolfe *v.* Peterson, 2 Bro. P. C. 436, cited 2 Comyn's Con. 537, the landlord having leased to a tenant lands, including some old meadow ground that had been afforested for years, and preferring to continue it in that condition either for the restoration of the soil, or for hunting sports, chose to consider the tillage of that meadow particularly detrimental, and got the tenant to agree not to till it, and if he did, to pay 5*l.* for every acre he should till. This was permitted to pass the ordeal. The criterion attempted was, that where, from the stipulations, the thing to be done or omitted is injurious, the parties may anticipate the assessment of a jury, and themselves fix the measure of damages. This, it was seen, might suit instances of moderate exaction, small imposition, but not grasp the enormities to which, as an established rule, it might lead and plainly invited. Lowe *v.* Peers, 4 Burr. 2225, came on before Lord Mansfield. "If I marry any woman other than Catharine Lowe, I will, three months afterward, pay her 1000*l.*" His lordship gravely considered, that to lose such a husband, was a great injury to

[Bright *v.* Rowland.]

Catharine Lowe, an injury difficult for the jury to measure, and besides the sum was not accessional, but the substance of the contract; and so she got the stipulated equivalent of a husband. 2 Comyn's Con. 538.    Fletcher *v.* Dyche, *Ibid.* 540; an agreement under a penalty, for work on a church at stated prices, to be finished by a named day, and to pay 10*l.* per week for every week the work should be unfinished.    After much discussion about two penalties in the same instrument, the court held that this 10*l.* though a forfeiture, was such as equity would not relieve; and as there was a plain injury which the parties might anticipate and settle, it was recovered.    Sloman *v.* Walter, *Ibid.* 541; covenant to allow Walter the use of a room in a coffee house when he saw fit to occupy it, or to forfeit 500*l.*; a recovery of the forfeit was had, but enjoined by Lord Chancellor Thurlow, who considered the enjoyment of the object as the chief intent of the deed, and the penalty accessional.    In that case, the parties called the forfeiture a penalty. Now, beyond the case as reported, let us ask on what ground did the chancellor or his predecessor relieve against a penalty? The contract required the sum to be paid as an equivalent for the thing stipulated to be done or omitted; and though it might be called accessional to the main object, it was equally contracted; and why relieve the man from what he had promised?    What was the real, though not avowed principle of the first relief granted on this score?    Nothing short of the foundation conservative prerogative of judicial power, that of doing justice.    It was plain that if the leader of that gang of contracts should pass the review unhurt, his progeny would soon fill and devour the land. It was only a forfeiture beneath a new guise, that had before crept into the mortgage.    But suppose Walter had been craftier than the gripers of his day, and had inserted in his contract, that on a failure to afford him the use of the room, the 500*l.* should be paid him as liquidated damages, the contract, in substance, would have been the same; the primary and accessional branches would have been there; and it is not to be supposed that the clear and powerful mind of Thurlow could have lost the substance under the change of a name.

We come now to Astley *v.* Weldon, 2 Comyn's Con. 542; agreement, that Miss Welden, for a salary to be paid weekly, should

[Bright *v.* Rowland.]

attend rehearsals, and perform on Astley's stage three years; and that either, for failure, should pay the other 200*l.* to be recovered in any of the king's courts. She did not play, or it may be, dance regularly, and was sued. The jury found 20*l.* or 200 dollars, as the law might be on the contract. The strongest possible language was used in the instrument to overreach the doctrine of penalty, to prevent all disputation in the courts about terms, and to adjust, by solemn convention, what should be the recovery itself upon a breach of the primary stipulation, the 200*l.* was to be recovered in any of his majesty's courts. Lord Eldon declared himself embarrassed in finding the principle on which such cases should turn; disliked to adopt the criterion of the excessiveness of the sum, as one too fluctuating, but yet felt constrained, by necessity, to adopt it; and judgment went for the 20*l.* and not for the 200*l.* Here we have an express authority for disregarding the words of the accessional clause, and for looking into the primary stipulation as affording a more just measure of damages. And here we may be allowed to say, that if the principle struck out by Lord Thurlow had been held in view, there could not have been any difficulty. The clause in which the 200*l.* appeared, was accessional, looked to the breach of the chief engagement, and annexed a forfeiture. A secondary rule might be, that if the sum put as an agreed compensation for the performance or omission of an act or acts, be plainly inserted as a matter of estimate of the injury contemplated, and not as a trap or forfeiture, and the amount be not obviously excessive, then it may be liquidated damages. Such were the three first cases above noticed.

Slauson *v.* Beadle, 7 Johns. Rep. 72. The contract was, that in consideration of 500 dollars received, B. covenanted to convey a lot by a set day, or in lieu thereof pay 800 dollars: *Held,* liquidated damages. The case was decided without argument. There is nothing in the agreement plainly unfair or excessive. The 800 dollars would be only refunding the 500 dollars, and compensating the probable loss and inconvenience in not getting the lot.

Hasbrouck *v.* Tappen, 15 Johns. Rep. 200. The agreement in November, was, that on the 1st of January following, a lot

[Bright *v.* Rowland.]

should be conveyed, should be previously surveyed, and on that day 1250 dollars should be paid for it on the delivery of the deed; and they agreed to pay, the one to the other, 500 dollars as liquidated damages. Tappen failed to have the survey, or make the deed on the day. The other did not claim the forfeit. Afterward Tappen offered the deed, but there were incumbrances on the lot, and the deed was refused by Hasbrouck, who sued for the 500 dollars. It was tacitly conceded that the damages were liquidated, and the only point raised was, whether Hasbrouck, by waiving the time of performance, might claim the damages. The contract was much like that in the preceding case. The lot was priced at 1250 dollars, and it might be that 500 dollars was no excessive equivalent for the loss of the bargain. No trap could be seen in it.

The leading case in New York is one of far different import. It affords great and instructive authority upon the subject, and is perfectly decisive of the case at bar. It is Dennis *v.* Cummins, 3 Johns. Cases, 297, an exchange of lands in Ontario in part, for a farm in Canaan worth 3750 dollars, and it was agreed that either party failing, should pay to the other who should perform on his part 2000 dollars damages. The term "damages," the mark of the gang, appeared on the brute! Thomson, J., without argument, delivered the opinion of the court. He had no difficulty! This was a full blooded penalty! With Mansfield, he thought the substance of the matter should be reached. He could not presume the parties really had in view the 2000 dollars as the actual damage, when one farm was only worth 3750 dollars, and the other far less. Here he saw the trap: and here, it might also have been added, a forfeiture, as distinct from fair honest compensation, stood disclosed. The judge notices, too, the principle of necessity, adopted by Eldon, in declaring that the decided cases of liquidated damages were, in instances in which the sums barely exceeded the damages sustained, or where, from the nature of the thing, the jury could have no satisfactory criteria of assessment, and the parties had manifestly themselves computed the amount. To hold the 2000 dollars in the case before him as a liquidated sum, " would be excessive and unreasonable in the extreme." And yet, was it not " so nominated in the bond?"

[Bright *v.* Rowland.]

The word " damages" was as decisive language as the parties could have used. But the words were only regarded to find out the nature of the primary stipulation, and the true character of the accessional one. The parties called the forfeiture damages. The court declared it penalty. As a penalty, it lost its sting. The overreaching cunning of avarice was rebuked, and its ravenous hand paralysed. Here is a resort to first principles; not to manacle and overpower; not to cater for the strong or the crafty; but to help the circumvented, to put down fraud and oppression, and show forth to the world that there is an efficient energy in the law to compel the exhibition of truth and common honesty in contracts. Who is it that cannot hail with enthusiasm such a decision.

Let the last authority be applied. The land to be conveyed was put by the parties at 7000 dollars in gales, about equal to 5000 dollars down. Did B. think it worth 5000 dollars more? Then why was he not ready and importunate on the day? If R. thought it worth 5000 dollars more why was he not ready too on the day and his good lady prepared to relinquish dower, a matter to be noticed more specially in the third division of the subject? The land was priced fairly. R. was to retain the possession and use, and B. to retain his money until the day, and no injury until that day, could ensue to either. Here a forested meadow was not to be ploughed, and the coveys and partridges routed: a church was not to be left for weeks unfinished and the expected edification of a parish postponed: nor was a good woman to languish for her espousals, with hope deferred, and then to be yielded up to unmitigated despair. No such palpable injury was occurring or to happen. What injury should follow a failure to perform on the day? The result was, that both kept what they had before, and was it for the pleasure or pain of keeping it, they should watch the wolf trap? Is it to be believed, as Thompson inquired, that they had honestly computed and found 5000 dollars, as the measure of an injury that would be mutual? Let us see. If B's injury would have measured out 5000 dollars, then precisely that sum did R. save by the failure, and he is found prowling for 5000 dollars more! If R. would have gained 5000 dollars by performance, then it is rather too severe on B. to pay him 5000

dollars for getting that benefit! It is, therefore, plainly impossible that the injury could be much on either side, and utterly impossible that it could be equal or reciprocal. The accessional claim plainly utters a falsehood on its face. If either party were seeking enforcement of the primary obligation, then though it might or might not be a hard bargain, it would be fair and legal. We have their *aggregatio mentis* as to the price; and as there is no injury for the non-performance, nothing being delivered or paid, but the loss, if any, of being left in *statu quo,* the measure of that loss could be somewhat like that for a killed dog. This action is to spring the trap, and when we see a man retaining his estate, receiving no conceivable injury, and yet reaching into his neighbor's pocket, for the cash value of that estate upon a speculating gambling clause, a forfeiture foisted into an agreement, a libel on all honest dealing, what are we to call it? It is not robbery, for it is not sought with violence; but it is worse, for the courts, consecrated to justice and the administration of the laws, are asked to give to the exaction the influence, example and authority of their sanction! In view of the injustice to be inflicted by the judgment in this case, but incomparably more in regard to the influence a confirmation of it by this tribunal must have on the morals of the community, and the pecuniary safety of the confiding and unwary, it is hoped, nay, respectfully urged upon the court, to give due deliberation to this branch of the subject, to regard the reasoning offered if good, or reject it if fallacious, and at all events, to put down upon its archives a fit reprehension of this class or gang of contracts, so as to limit their rapacity.

3. Whatever be the obligation of the last clause of the agreement, the performance of its stipulations by R. was wholly insufficient. This point is variously raised by the demurrer. The averments in regard to the land are that B. having failed to pay, &c., R. on the 2d, not 1st of January, signed, sealed and offered to deliver the conveyance, and there are no readiness, ability and offer, to deliver possession at any time, and the deed introduces Mrs. Rowland as a party, but does not contain her signature or relinquishment of dower. It will be observed, that as all the defects except that on the imperfection of the conveyance were designated by and urged on the first demurrer, they would have

[Bright *v.* Rowland.]

been healed in the second declaration, from the hand of a pleader seldom if ever surpassed for acumen, accuracy, and skill in that department of the profession, if more could have been proved than is alleged, so that it will not be denied but be admitted, that the whole case is on the record.

If the conveyance had been such as to pass the whole estate, it was not ready and offered on the day.  Every thing to be done, was to be done on one and the same day, so that the covenants were, according to the natural order of the things to be done, dependent, and mutually, and coetaneously to be performed.   R. was vendor, and on him devolved the first move, from him was to proceed the first consideration.   It was essential in order to be entitled to receive, that he should have been ready, able, and willing, and to offer performance on his part on the appointed day.   This was imperative on him since the agreement was wholly executory, and no part performance had been tendered or received.   His ulterior rights were to be fixed on that day, save only by a waiver of time, by the vendee expressly given, which, here was not extended.   In dependent covenants to be simultaneously performed, the order of performance is not to be according to the language of the instrument, but the natural priority of the things to be done.   Thus, though the contract may say that the vendee is first to pay, and then the vendor is to convey, the books declare that this may be done by covenants that are independent, but where the performances are to be coeval, the vendor is to be ready, able, willing, and make the first move.   In this example, the parties are not to be presumed to be looking for a breach; both are to be prepared, and it would be to convert such agreements into traps, to allow the vendor to insist first on payment made, or the vendee to require conveyance delivered; for then the one or the other might hold back and avail of the advantage.   Both are to be ready, and the vendor is first to exhibit his readiness. There is this modification of the rule, that where one thing must necessarily precede another, the precedent thing must be first done, as here no lien could be given by B. until the title was actually passed to him.   R. should have been able and willing on the day, to have conveyed the whole title, and offered so to do.   That he was thus able, or did so offer, is not averred, or that at any time

he was either able or willing to give possession. This view is sustained by the books.

Green *v.* Reynolds, 2 Johns. Rep. 207, covenant to convey on a day named, and to pay on that day part of the price, and the residue on a future day. The vendor sued on the covenant to recover the first sum, without averring he had tendered a deed on the day. There was a general demurrer. After a citation by the counsel of the English doctrine, which confirms the principles above asserted, Kent, C. J., declared—" It has been decided in this court in regard to a contract for the delivery of stock, that the delivery and the payment of the money were dependent covenants, and that the plaintiff must aver a performance, or an offer to perform;" and the whole court held the covenants in the case to be dependent. " The 1000 dollars being in part, &c., to be paid on the same day the deed was to be delivered, the fair intent and good sense of the contract is, that the money is not to be paid until the deed is ready for delivery. The declaration therefore, is defective, in not averring a tender of the deed by the plaintiff." Judson *v.* Wass, 11 Johns. Rep. 525; Jones *v.* Gardner, 10 *Ibid.* 266; Gazely *v.* Price, 15 *Ibid.* 267; Harden *v.* Krelzenger, 17 *Ibid.* 293, are also in point. In Jones *v.* Gardner, the vendor bound himself to convey if the vendor then paid the 500 dollars, and in reference to this feature, the court says, " The intent and good sense of the contract was, that the 500 dollars were not to be paid unless the deed was ready for delivery." It is, therefore, established, that, though the conveyance which Rowland tendered after the day, might have been a sufficient transmission of the title, if received, yet that Rowland not being ready to deliver, and not having offered possession on the day designated, he utterly lost all right under the agreement. And here it might be challenged, that no reported case could be found on earth, where a party seeking a naked, cold-blooded forfeiture, enormous and shocking in amount, or any sort of mere forfeiture, was ever allowed to prevail, without having himself walked the line with perfect precision, as to form, time, and circumstance, as well as substance. The principles, no, not principles, nor even dogmas, but intellectual process of the judge below, which impelled him to overrule the demurrer, was not given, and seems to have lain

[Bright *v.* Rowland.]

far behind the age of the schoolmen, and the black-lettered tombs surrounding them.   It will be corrected here.

But the conveyance was insufficient.   If it had been tendered on the appointed day, it would not have been a performance; but Bright might well have rescinded the agreement by refusing to accept it or proceed toward performance.   It very properly introduced Mrs. Rowland as a party alienor; and if she had signed, and on privy examination relinquished dower, it would have been well.   It is signed by Rowland, and he thereby acknowledged the being, name, and coverture of his wife.   Cramer *v.* Bradshaw, 10 Johns. Rep. 484.   The words grant, bargain, or sell, in the conveyance, was a covenant of seisin, against incumbrances, and for quiet enjoyment.   Rev. Code, 459, 460.   What, by the agreement, did Bright bargain to get? and what did Rowland bargain and covenant to sell and convey?   The 239 acres at 30 dollars per acre, or the 239 acres at that full price subject to dower?   The whole or two-thirds?   It does not appear if there be issue, or if issue that there are more than one, and if none, or only one, the dower would be one half around the dwelling.

There was no insurance of Rowland's life. On the 1st of January, 1837, it could not be seen he would survive the next day or month.   We must place ourselves at that date.   Was Bright to get the whole land subject to dower, or free from that incumbrance?   No answer was given to this question in the court below.   Doubtless it was a pearl retained as only fit to be opened to view, in this higher and last sanctuary of justice.   If there be one, let it come forth and be regarded as a rare legal gem!

In Cluts *v.* Robinson, 2 Johns. Rep. 613, Kent, C. J., holds, that " a covenant to convey lands does not mean merely a conveyance good in point of form.   That would be a covenant without substance.   But it means an operative conveyance; one that carries with it a good and sufficient conveyance of the lands to be conveyed."

Jones *v.* Gardner, 10 Johns. Rep. 266, was an action by the vendor, to recover part of the price on a covenant containing dependent covenants, to be performed simultaneously as in the case here.   The agreement did not mention that the vendor's wife should join in the deed, only " that a good and sufficient

deed," &c., should be made. The deed of the vendor alone was tendered on the day, which the vendee refused. The court held, that an objection to the deed was, " that the wife had not executed it with the solemnities required by law to bar her dower." " The title meant [was] the legal estate in fee, free and clear of all valid claims and incumbrances whatsoever. It is the ownership of land, the *dominium directum et absolutum,* without any rightful participation by any other person in any part of it. If the vendor's wife had a contingent life estate in one third part of the farm, the vendee had not a clear and absolute title. If this claim of dower was not inconsistent with the title to be vested, it would be difficult to maintain that any other life estate in the same in reversion or remainder, or any judgment, or other lien thereon, would be incompatible with it; and the title might thus be embarrassed and weakened, until it had lost all its value and strength." The vendee, defendant, had judgment. Our statute above quoted, whatever the difference in the words of the New York covenant might be, made that of Rowland in all things equivalent. There no forfeiture was sought as here. The import of the judgment below, was in total reversal of the doctrine quoted, and imported the monstrous proposition, that Bright was compelled to take the land at 30 dollars per acre, subject to Mrs. Rowland's third, or moiety, including the dwelling and improvements, or smart under the lash of liquidated damages.

Judson *v.* Wass, 11 Johns. Rep. 535, was a like action, and is full to the point, that if there be a mortgage on the land at the day when the simultaneous performance is to be made, the vendor is not in a condition to perform, or to call for damages, and that a covenant for a deed with warranty, means that an indefeasible title is to be passed.

Tucker *v.* Word, 12 Johns. Rep. 190, puts an outstanding lease on the same footing, under like circumstances.

References have been mostly made to the New York reports, and to the first reports, as being the most learned and elaborate as well as satisfactory; and surely there is no existing fountain of the common law so pure and instructive.

On the last ground, as on the second, the authority, if not the demonstration, has been furnished. The result cannot be feared;

[Bright *v.* Rowland.]

but it is hoped it will be so ample as to afford instruction and admonition, and set up landmarks for the protection of the country.

Buckner, for the defendant in error.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The most material question in the case arises out of the last clause of the covenant. For the plaintiff in error, it is contended, that it is a penalty, and that the actual damages sustained should be the measure of recovery; but for the defendant in error, it is insisted, that he had a right to recover the 5000 dollars as stipulated damages.

The authorities which bear a strict analogy to the case, so far as they have come under review, are not entirely reconcilable. The true principle, however, which must govern in the legal interpretation of the contract, is demonstrable by reason, and well defined by a majority of the authorities. We do not mean to assert that such a contract cannot in any case be enforced. As regards covenants of a certain description, it might. The distinction is, that an agreement for liquidated damages for the non-performance of covenants of an uncertain nature and amount, may be enforced, for the amount of the damages agreed on, but it cannot, where the covenant is certain and fixed as to the amount. This is the distinction taken in Kemble *v.* Farren, 6 Bingham, 141. The agreement was in substance this:—the defendant engaged to act as comedian at Covent Garden theatre for four seasons, and in all things to conform to the regulations of the theatre. The plaintiff agreed to pay him 3*l.* 6*s.* 8*d.* every night the theatre should be open. It contained a clause that if either of the parties should refuse or neglect to fulfil said agreement, or any part thereof, or any stipulation therein, such party should pay to the other, the sum of 1000*l.*, to which sum it was thereby agreed the damages should amount, and which sum was thereby declared to be liquidated and ascertained damages, and not a penalty or penal sum, or in the nature thereof. The court said that if this clause had been limited to breaches which were of an uncertain nature and amount, it would have had the effect of ascertaining

*35**

the damages. It was, however, considered as a penalty, because it extended to covenants which were certain in amount. If the plaintiff had failed to make a single payment of 3*l.* 6*s.* 8*d.*, the defendant would have been entitled to the stipulated damages. The court very justly said, " that a very large sum should immediately become payable, in consequence of the non-payment of a very small sum, and that the former should not be considered as a penalty, appears to be a contradiction in terms. The same may be said in the present case. The two cases are not distinguishable in principle. The plaintiff in error was to pay 2400 dollars, for the non-payment of which the defendant in error claims 5000. The covenant on which the suit is brought is certain in amount as to plaintiff in error, and although the covenants of the defendant in error were uncertain, it does not vary the rule. This was also the nature of the agreement in the case cited, and then the suit was actually brought for the non-performance of an uncertain covenant, and still the rule was properly applied, because mutual covenants must be mutually binding on both parties, and when they are not obligatory on one, they are not on the other.

The same rule is also recognised in the case of Dennis *v.* Cummins, 3 Johns. Cas. 297, and also in the case of Gray *v.* Crosby, 18 Johns. Rep. 219, in which the further distinction was taken, that liquidated damages must be in lieu of a performance of any thing that is covenanted to be done, and operate as a discharge of the covenant, in all cases where they can be recovered. Admitting, then, that the defendant in error could recover the stipulated damages in this case, would such recovery discharge the plaintiff in error from his covenant? It is not by any means certain that it would, but this question need not now be discussed.

The case of Rielly *v.* Jones, 1 Bingham, 302, cited at bar, is in conflict with these decisions. It was decided, however, some time anterior to the case of Kemble *v.* Farren, and as it was cited on the argument of the latter case, it may be considered as virtually, although it was not expressly, overruled. The judges briefly delivered these opinions *seriatim*, but did not, as did Tindal, C. J., in Kemble *v.* Farren, give any reasons for their decision, further than that they conceived it to have been the intention

[Bright *v.* Rowland.]

of the parties to fix the damages, and that no authority had been produced against it.   We, therefore, think the case of Kemble *v.* Farren, contains the true rule, and as it is well fortified by the case of Dennis *v.* Cummins and Gray *v.* Crosby, we must adopt it, and we think that it applies in its full extent to the case before us.   The object of the parties must have been to secure a performance of the contract in all its parts.   Suppose Bright had paid for the land, but had failed to pay for the corn or the fodder, such failure would have been equally a breach of the covenant, and could it be seriously contended that 5000 dollars could be recovered for the non-payment of 406 dollars and 25 cents, which was the price of the corn?   Such a position cannot be maintained, and yet it would be the result if a breach of the covenant gives the right to the damages claimed.   This conclusion shows, that the above rule is founded on the strictest principles of justice, and although injustice may sometimes be done where the covenant is uncertain, and liquidated damages are recoverable, yet it arises from the impossibility of fixing truly the amount of damages, and the parties are allowed to fix them themselves.

It is said that this question is not reached by the demurrer. That is true; but the court after overruling the demurrer, gave judgment by default, for the full amount of the damages claimed, and this was error which is fairly presented by the record.

Another ground taken in the argument is, that Rowland did not tender such a deed as he was bound to do.   The deed tendered is pleaded with a profert, and although that was unnecessary, being mere inducement, yet having made profert, the defendant was entitled to oyer, which he prayed and set out the deed.   It is sufficient to remark on this subject that Rowland was not bound to plead a tender.   His agreement was to make a deed, after he should receive the money, and this made the covenants independent.   He was only bound to plead a readiness to perform his part.   If they had agreed to make title and pay the money on the same day, without specifying as particularly as they have done, which act was to be performed first, the covenants would have been dependent.   Rowland, however, did tender a deed with warranty, and it is a sufficient answer to this objection, that Bright did not object to its sufficiency.   The

[Bright *v.* Rowland.]

rule is, that if a title be tendered, which appears on its face to
conform to the contract, if there be an objection to it, on account
of incumbrances, the party who is to receive it, must make his
objections, as an excuse for refusing to receive it.   Brown *v.*
Bellows, 4 Pickering, 179.

This objection is, therefore, not well-founded, but on the first
point, the judgment must be reversed, the cause remanded, and
a *venire de novo* awarded.